**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| CARDIONET, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FOY GILBERT,<br><br>Defendant. | Civil Action No. ___________________<br><br>**JURY TRIAL DEMANDED** |

# VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

## INTRODUCTION

This case involves the intentional theft of CardioNet, LLC's ("CardioNet") trade secrets and confidential business information by Defendant Foy Gilbert ("Gilbert"), a former CardioNet Account Executive. In the weeks before the end of his employment, and while still employed by CardioNet, Gilbert methodically exfiltrated CardioNet's sensitive confidential information and trade secrets. Gilbert then immediately joined a competitor in virtually the same position and account territory as his CardioNet employment. The only explanation for Gilbert's unlawful exfiltration of CardioNet's confidential information and trade secrets is to use them to target and solicit the same customers in the same territory he serviced for CardioNet for his new employer.

Gilbert spent approximately three years at CardioNet building relationships with healthcare systems and providers across the Greenville-Spartanburg-Anderson, South Carolina territory for CardioNet's benefit. During that time, he had access to CardioNet's confidential information and trade secrets: comprehensive Customer Outcomes Reports generated from CardioNet's proprietary Ambulatory Monitoring & Diagnostics ("AM&D") Database; confidential account volume and cost data from CardioNet's Salesforce Customer Relationship Management Software ("CRM");

contracted payor information; customized clinical notification criteria reflecting years of provider-specific configuration work; and confidential customer communications revealing details of CardioNet's service delivery. Gilbert resigned from CardioNet on June 29, 2026, and his last day of employment was July 10, 2026.

Unbeknownst to CardioNet, in the weeks before his departure, Gilbert engaged in a calculated campaign of data theft. Between June 15 and July 1, 2026, he systematically emailed at least 15 separate documents containing CardioNet's confidential information and trade secrets from his corporate email to his personal Gmail account and then deleted the sent emails to conceal his conduct. The exfiltrated materials included, among other things, Salesforce reports expressly marked 'confidential and not for distribution,' copyrighted Customer Outcomes Reports bearing Philips' copyright notice on every page,[1] reports originally transmitted via encrypted secure email, and a confidential customer inquiry regarding CardioNet's processes that Gilbert forwarded to himself without ever responding to the customer.

Gilbert now works for Wearlinq, a direct competitor in the ambulatory cardiac monitoring space, as Business Development Manager, operating in the same geographic territory and targeting the same accounts he had served at CardioNet. His possession of CardioNet's confidential information and trade secrets is not incidental. Armed with this information, he has a roadmap of CardioNet's account relationships, average out-of-pocket costs per practice, clinical configurations, and account-specific intelligence and can replicate years of CardioNet's customer development work overnight. Gilbert has already begun soliciting the accounts he serviced at CardioNet and has, or will, use the confidential information and trade secrets to do so. His

[1] CardioNet is a wholly owned subsidiary of BioTelemetry, Inc. Royal Philips, through a wholly owned subsidiary, acquired BioTelemetry in 2021, after which CardioNet became the main business within the newly formed business unit, or division, known as Philips Ambulatory Monitoring & Diagnostics. Accordingly, many of CardioNet's materials bear Philips' copyright notices and branding.

improper conduct threatens monetary and irreparable harm to CardioNet, including the disclosure of its trade secrets, the loss of customer goodwill, and competitive advantage.

CardioNet brings this action to halt the ongoing and irreparable harm caused by Gilbert's improper acquisition and misappropriation, or threatened misappropriation, of CardioNet's confidential information and trade secrets, and to obtain damages for the harm CardioNet has already suffered and continues to suffer.

## PARTIES

1. Plaintiff CardioNet, LLC is a single member limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 1000 Cedar Hollow Road, Malvern, Pennsylvania 19355. CardioNet is a wholly owned subsidiary of BioTelemetry, Inc. ("BioTelemetry"). In 2021, Royal Philips, through a wholly owned subsidiary, acquired BioTelemetry, and CardioNet was the cornerstone of the newly formed Philips AM&D business unit.

2. Defendant Foy Gilbert is an individual and citizen of the State of South Carolina who resides at 401 Dunrobin Lane, Simpsonville, South Carolina, 29681. Gilbert was formerly employed by CardioNet as an Account Executive from approximately July 17, 2023 through approximately July 10, 2026. Gilbert is currently employed by Wearlinq as Business Development Manager.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Count I arises under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District. Gilbert resided and worked in this District during his CardioNet employment; the exfiltration of CardioNet's confidential information and trade secrets occurred in this District; the targeted customer accounts are located in this District; and Gilbert's current competitive activity on behalf of Wearlinq is directed at accounts in this District.

5. This Court has personal jurisdiction over Gilbert because he resides in South Carolina, committed the acts giving rise to this action in South Carolina, and is conducting the competitive activity complained of in South Carolina.

## FACTUAL BACKGROUND

### CardioNet's Business

6. CardioNet is a wireless medical technology company and a leader in cardiovascular health. It provides electrocardiogram diagnostic services to healthcare systems, cardiology practices, hospitals, and federal healthcare agencies across the United States.

7. CardioNet's core services include: (a) MCOT® (Mobile Cardiac Outpatient Telemetry), which provides connected, heartbeat-by-heartbeat ECG analysis and transmission; and (b) Holter and event monitoring, including traditional and extended-wear solutions such as the ePatch, to capture intermittent heart rhythm disorders.

8. The ambulatory cardiac monitoring industry is intensely competitive, and most accounts are not contractually bound. Customer retention therefore depends largely on trust, service quality, and account executives' ability to develop customer relationships. Through those relationships, CardioNet develops customized clinical notification protocols tailored to individual provider preferences and detailed business intelligence regarding sales volumes, payor mix, and referral patterns; confidential and proprietary information developed, refined, and maintained over many years and at a cost of millions of dollars that provides CardioNet a significant competitive advantage.

**<u>CardioNet's Confidential Information and Trade Secrets</u>**

9. CardioNet maintains extensive categories of confidential and proprietary information, including without limitation:

a. **Customer Outcomes Reports**: 12-page proprietary reports generated from CardioNet and Philips' AM&D Database containing comprehensive data on patient enrollment volumes, service utilization by monitoring type (MCOT, event, Holter), arrhythmia detection rates and notification timelines, referral payor distribution and revenue mix, top ordering provider rankings by name and referral volume, service-choice-by-diagnosis breakdowns, wear time analyses, and demographic data. These reports bear Philips copyright notices ("© Koninklijke Philips N.V.") on every page and are generated exclusively from CardioNet and Philips' proprietary database systems.

b. **Account volume data**: annual volume numbers, including years of sales performance and customer relationship data across CardioNet's territories, for accounts extracted from the Salesforce CRM system, which CardioNet expressly marks "confidential and not for distribution."

c. **Contracted payor and cost data**: internal reports showing contracted payors and average out-of-pocket expenses by account territory, which are secured internally via secure encrypted email due to their sensitivity.

d. **Customer notification criteria forms**: proprietary CardioNet Cardiac Monitoring Notification Contact Information Forms ("Notification Forms") containing account-specific clinical configurations including provider names, contact information, customized notification thresholds for urgent and emergent cardiac events (including specific heart rate and duration parameters), and monitoring preferences tailored over years of collaboration with individual healthcare providers.

e. **Confidential customer communications**: including communications regarding service quality, patient safety concerns, and operational details that reveal CardioNet's service delivery capabilities and areas for competitive differentiation.

10. This information derives independent economic value from not being generally known to or readily ascertainable by CardioNet's competitors. A competitor armed with this data could replicate years of CardioNet's customer development efforts and customer relationships, target CardioNet's most valuable ordering providers by name, tailor competing service offerings to match CardioNet's customized configurations, and exploit service and product details, all without incurring the time and expense CardioNet invested in developing this intelligence.

**<u>CardioNet Protects Its Confidential and Proprietary Information and Trade Secrets</u>**

11. CardioNet implements numerous measures to protect the secrecy of its confidential and proprietary information and trade secrets.

12. CardioNet has a company-wide confidentiality policy requiring all employees to safeguard "business secrets and proprietary information, intellectual property and trade secrets,"

and defining protected information to include "data about research, operations, products, projects, plans, strategies, manufacturing, marketing, finances, customers, consumers, suppliers, business partners and any other third parties associated with Philips" (Attached as Exhibit A) ("Confidentiality Policy").

13. The Confidentiality Policy expressly states "[i]t is unethical and illegal for you to use Philips information for personal gain" and directs employees to "[l]imit the distribution of proprietary or sensitive material to those who must know about it within Philips and our business partners." *Id.*

14. In addition to CardioNet's Confidentiality Policy, CardioNet also does the following to protect the secrecy of its confidential and proprietary information:

a. Requires employees to complete training on "Living Integrity" and "General Business Principles," which explain that employees may not disclose company confidential information or trade secrets. Gilbert completed such training on July 6, 2026, just days before leaving CardioNet;

b. Marks Salesforce CRM reports as "confidential and not for distribution;"

c. Secures sensitive financial data via Zix encrypted email;

d. Generates Customer Outcomes Reports exclusively from CardioNet and Philips' proprietary AM&D Database, with copyright notices ("© Koninklijke Philips N.V.") on every page;

e. Designates sensitive customer communications with "Sensitivity: Confidential" markings;

f. Stores confidential information on password-protected systems accessible only through unique employee credentials together with dual-factor authentication through employee's mobile phones;

g. Uses role-based access controls to limit employees to the systems and information necessary for their assigned responsibilities;

h. Revokes departing employees' access to Salesforce and email systems upon separation, and requires the return of company-issued laptops; and

i. Sends departing employees an offboarding confidentiality acknowledgment form requiring their acknowledgment of their continuing confidentiality obligations.

**<u>Gilbert's Employment at CardioNet</u>**

15. Gilbert began his employment with CardioNet as an Account Executive on July 17, 2023 and held that position until he resigned to join Wearlinq.

16. Gilbert's sales territory was the Greenville-Spartanburg-Anderson, South Carolina area – a large territory for CardioNet – where he was responsible for managing CardioNet's customer relationships with significant healthcare systems and healthcare providers in the territory.

17. As an Account Executive, Gilbert was responsible for orchestrating the sales process from lead identification, prospecting new business, maintaining and growing existing client accounts, and ensuring sales strategies met revenue objectives while promoting CardioNet's products and services.

18. Gilbert, like all CardioNet Account Executives, called on cardiologists, electrophysiologists, and hospital administrators, both in the office and in clinical settings, to drive sales revenue and overall market share inside his territory, nurtured existing account relationships, and communicated CardioNet's competitive differentiation and value proposition to enhance sales

and convert competitive accounts. By nature, his role required daily access to the confidential and proprietary information and trade secrets CardioNet now seeks to protect.

19. Because of the volume of patients associated with customer accounts who are utilizing CardioNet's services, Account Executives such as Gilbert spend approximately 70% of their time managing services and addressing operational details for their assigned accounts. CardioNet's Account Executives and other employees in sales roles function as an extension of CardioNet's clinical services team and are responsible for ensuring CardioNet's monitoring services work correctly for every patient and consistent with provider preferences. This level of embedded engagement is what builds the trust-based relationships upon which CardioNet's competitive position depends.

20. Gilbert was a top performer at CardioNet. Per his own representations on LinkedIn, he grew territory revenue 32.5% from January 2024 to January 2025; won the 2024 Presidents Club award (finishing 5th out of 125 Account Executives nationally); was named the 2024 and 2025 Atlantic South Region MVP; grew territory revenue 37% in 2025 compared to 2024; was ranked #1 in the nation in revenue growth in 2025 versus 2024 with over $2 million in growth revenue; and led the nation in volume and revenue for the first half of 2026.

21. The customer accounts in Gilbert's former territory generated more than $2 million in revenue for CardioNet during the second quarter of 2026.

22. Gilbert's role granted him substantial discretion in managing customer relationships across multiple healthcare systems in his territory. To perform his job duties and manage customer relationships, Gilbert had access to, and CardioNet entrusted him with confidential and proprietary information and trade secrets, including Customer Outcomes Reports,

account volume data, contracted payor and cost data, Notification Forms, and confidential customer communications.

23. Gilbert worked with his assigned accounts extensively over several years to align notification criteria to the workflows and demands of his accounts' providers. His intimate knowledge of these accounts, combined with his access to CardioNet's proprietary and confidential data and information, placed him in a unique position to cause competitive harm if he chose to exploit that access for the benefit of a competitor.

**Gilbert Submits His Notice of Resignation**

24. On June 29, 2026, Gilbert informed Area Vice President of Sales, East, Matt Dickens, he was resigning from CardioNet and had accepted a position at Wearlinq, a competitor.

25. To ensure a smooth transition of his territory and accounts, CardioNet and Gilbert agreed that his last day of employment would be July 10, 2026.

26. CardioNet allowed Gilbert to maintain his email access through that date because Gilbert was ostensibly assisting with the transition of services in his territory. Although Gilbert assisted with the transition of one recently onboarded health system by accompanying CardioNet representatives to each of that system's locations, he refused to visit the locations associated with the other health systems in his territory, stating that doing so might be "weird." Gilbert did, however, provide Mr. Dickens with a list of contacts for various accounts in his territory.

27. On July 6, 2026, as part of his off-boarding process, Dickens sent Gilbert the Confidentiality Policy and an acknowledgment form and asked him to sign and date the acknowledgment form. Gilbert ignored the request.

28. CardioNet revoked Gilbert's access to Salesforce several days before his last day of employment and terminated his email access on July 10, 2026, his last day of employment.

**Gilbert Surreptitiously Exfiltrates CardioNet's Confidential Information and Trade Secrets**

29. Unbeknownst to CardioNet, in the weeks before Gilbert's employment ended, Gilbert engaged in a deliberate and systematic campaign to exfiltrate CardioNet's confidential information and trade secrets from his CardioNet corporate email account (Foy.Gilbert@Philips.com) to his personal Gmail account (foyg95@gmail.com) and then deleted the sent emails to conceal his conduct. For example:

a. **June 15, 2026**: Gilbert emailed himself competitive intelligence – notes referencing CardioNet's services for a specific patient – that he was preparing to use as a selling point on behalf of Wearlinq against CardioNet with the lead electrophysiologist and key decision maker at Account 2.[2] This shows Gilbert was actively preparing to unfairly compete with CardioNet while still employed by, and receiving compensation from, CardioNet.

b. **June 17, 2026: Between 7:16 AM and 7:22 AM**: in a six-minute span, Gilbert forwarded five separate Salesforce account volume reports for the largest accounts in his CardioNet territory to his personal Gmail address: Account 1 (7:16 AM), Account 2 (7:17 AM), Account 3 (7:19 AM), Account 4 (7:21 AM), and Account 5 (7:22 AM). Each of these reports was extracted from CardioNet's Salesforce CRM system using Gilbert's credentials and dual-factor authentication and was clearly marked "confidential and not for distribution."

c. **June 18, 2026: Between 6:00 AM and 6:04 AM**: Gilbert forwarded three highly sensitive documents within a four-minute window: the contracted payor/average out-of-pocket expenses report for his territory (6:00 AM); the

[2] To preserve confidentiality, CardioNet's clients are identified herein by account numbers rather than by name.

Customer Outcomes Report for Account 1 (6:03 AM); and the Customer Outcomes Report for Account 2 (6:04 AM). The payor report had originally been sent to Gilbert via Zix secure encrypted email. Customer Outcome Reports are 12-page proprietary reports generated from CardioNet and Philips' AM&D Database bearing Philips' copyright notices on every page. They contain a compilation of confidential patient and ordering information for each account, including detailed breakdowns of payor mix, referrals by top 15 ordering providers (identified by name), service choice by diagnosis, arrhythmia detection and notification rates, and wear time analyses.

d. **June 30, 2026**: Gilbert forwarded four Notification Forms – three for Account 1 and one for Account 2 – to his personal Gmail account. These forms contain account-specific clinical configurations, including specific provider names, contact information, customized notification thresholds for urgent and emergent cardiac events, and monitoring preferences developed and refined over years of provider-specific collaboration.

e. **July 1, 2026**: Gilbert forwarded to his personal Gmail account a confidential email he received that morning from the Manager of Cardiovascular Services at one of CardioNet's large accounts, raising an inquiry about CardioNet's processes. The customer copied the account's purchasing decisionmaker in the region. Gilbert forwarded this confidential customer communication to his personal email and then deleted it *without ever responding to the client.* On information and belief, Gilbert intends to use this confidential communication

as a competitive selling point for Wearlinq when approaching the account's decision makers.

30. In total, Gilbert exfiltrated at least 15 separate documents containing CardioNet's confidential information and trade secrets in the 17 days before resigning. Selected emails Gilbert sent from his CardioNet email to his personal email are attached hereto as Exhibit B.

31. His conduct was not impulsive or accidental – it was a methodical extraction of the precise categories of confidential information that would be most valuable to a competitor entering the same market and targeting the same accounts.

32. There was no business reason for Gilbert to send the confidential documents to his personal Gmail account, and therefore, the only explanation for why he did this was to use the information to harm CardioNet and benefit Wearlinq.

33. Gilbert's deletion of the sent emails after forwarding them to his personal account demonstrates consciousness of wrongdoing and an intent to conceal his theft from CardioNet.

**Gilbert Joins Wearlinq and Targets CardioNet's Accounts**

34. Days after his departure, Gilbert began his employment with Wearlinq as a Business Development Manager assigned to the same Greenville-Spartanburg-Anderson, South Carolina territory to which he was assigned at CardioNet.

35. Wearlinq is a direct competitor in the ambulatory cardiac monitoring market. Like CardioNet, Wearlinq provides remote cardiac monitoring through a product called eWave monitor, a wireless 6-lead ECG wearable, a patient mobile application, and an AI-driven clinical reporting tool.

36. Gilbert is now actively targeting the same accounts he previously managed for CardioNet, armed with the comprehensive confidential information and trade secrets he exfiltrated

from CardioNet. On information and belief, Gilbert has visited multiple former CardioNet accounts and has scheduled lunches to meet with physicians at those accounts.

**Irreparable Harm**

37. Gilbert's improper acquisition and misappropriation, or threatened misappropriation, of CardioNet's confidential information and trade secrets has caused and continues to cause CardioNet irreparable harm. Gilbert possesses a roadmap of CardioNet's customer relationships, including: the highest-volume ordering providers at each account; each account's payor mix, revenue potential, clinical notification criteria service details, and annual patient volumes; and other information that allows Gilbert and Wearlinq to replicate years of CardioNet's customer development work overnight. Armed with this information, Gilbert and Wearlinq can target CardioNet's most valuable referral sources, mirror CardioNet's proprietary service configurations, and exploit potential service vulnerabilities.

38. The resulting harm is ongoing and cannot be adequately remedied through monetary damages. CardioNet's customers are not contractually bound; therefore, customer retention depends on the relationships, goodwill, and trust developed over years of service. Once a competitor – particularly one armed with CardioNet's confidential information and trade secrets – converts an account, the account may be permanently lost. Moreover, once CardioNet's confidential information and trade secrets are disclosed, they can never be made secret again.

39. Gilbert's conduct since his departure confirms the immediacy of the threat. Mere days after Gilbert's last day at CardioNet, CardioNet learned that he had set up lunches with representatives from his previous accounts. This evidences that Gilbert had begun pursuing CardioNet's customers before CardioNet could complete the transition of his territory. Gilbert also refused to conduct on-location transition meetings for all but one health system, despite CardioNet

maintaining his email access through the end of his employment specifically to coordinate proper handoffs, which included in-person meetings. Viewed together with the contemporaneous exfiltration of CardioNet's confidential information and trade secrets, this conduct demonstrates Gilbert's intent to maintain those customer relationships and use CardioNet's confidential information and trade secrets for Wearlinq's benefit.

40. Gilbert's deliberate exfiltration of CardioNet's confidential information and trade secrets, immediate efforts to solicit CardioNet's accounts on behalf of a direct competitor, and refusal to facilitate the transition of his customer relationships have caused and threaten continued irreparable harm that cannot adequately be remedied through monetary damages alone. CardioNet therefore asserts the following causes of action and seeks injunctive relief and damages to redress Gilbert's unlawful conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ.

41. CardioNet re-alleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

42. CardioNet owns trade secrets as defined by 18 U.S.C. § 1839(3), including without limitation its Customer Outcomes Reports, account volume data, contracted payor and cost data, Notification Forms, and confidential customer communications, as described above. These trade secrets constitute financial, business, scientific, technical, and economic information, including compilations, that derive independent economic value, actual and potential, from not being generally known to or readily ascertainable through proper means by CardioNet's competitors, including Wearlinq.

43. CardioNet has taken reasonable measures to maintain the secrecy of its trade secrets, including marking documents "confidential and not for distribution;" transmitting sensitive data through encrypted email; storing information and generating proprietary reports through password- and dual-factor-authentication-protected systems accessible only through unique employee credentials; placing copyright notices on proprietary reports; maintaining a company-wide Confidentiality Policy; and requiring employees to acknowledge that policy during the off-boarding process.

44. CardioNet's trade secrets relate to products and services used in, and intended for use in, interstate and foreign commerce. CardioNet operates nationally, with headquarters in Pennsylvania and accounts spanning South Carolina, North Carolina, Alabama, and other states.

45. Gilbert misappropriated CardioNet's trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring them through improper means – specifically, by systematically emailing them from his CardioNet email account to his personal Gmail account and then deleting the sent emails to conceal his improper acquisition. Gilbert acquired those trade secrets through improper means within the meaning of 18 U.S.C. § 1839(6), including by breaching his duty to maintain their secrecy, and knew or had reason to know that his acquisition was improper.

46. Gilbert has disclosed or used, and threatens to further disclose or use, CardioNet's trade secrets without CardioNet's consent in connection with his employment at Wearlinq and his solicitation of CardioNet's customers. Gilbert's conduct has allowed him to shortcut years of customer development and goodwill by using CardioNet's trade secrets to advance his sales efforts at Wearlinq. Once disclosed or used, CardioNet's trade secrets cannot be restored to their prior state of secrecy, exposing CardioNet to the loss of exclusivity, diminished competitive advantage, lost customer relationships, and further unauthorized use and disclosure.

47. Gilbert's ongoing possession, use, or threatened use or disclosure, of CardioNet's trade secrets has caused and threatens to continue causing CardioNet immediate and irreparable harm for which there is no adequate remedy at law. CardioNet is therefore entitled under 18 U.S.C. § 1836(b)(3)(A) to injunctive relief preventing Gilbert's actual and threatened misappropriation.

48. As a direct and proximate result of Gilbert's unlawful conduct, CardioNet has suffered and will continue to suffer damages. Pursuant to 18 U.S.C. § 1836(b)(3)(B), CardioNet is entitled to recover its actual losses and Gilbert's unjust enrichment not addressed in calculating those losses. Because Gilbert's misappropriation was willful and malicious, CardioNet is also entitled to exemplary damages of up to two times the damages awarded under 18 U.S.C. § 1836(b)(3)(B) and an award of its reasonable attorneys' fees.

## COUNT II
## VIOLATION OF THE SOUTH CAROLINA TRADE SECRETS ACT ("SCTSA"), S.C. CODE ANN. § 39-8-10 ET SEQ.

49. CardioNet re-alleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

50. CardioNet owns trade secrets as defined by S.C. Code Ann. § 39-8-20(5), including its Customer Outcomes Reports, account volume data, contracted payor and cost data, Notification Forms, and confidential customer communications. These trade secrets derive independent economic value, actual and potential, from not being generally known to or readily ascertainable through proper means by the public or others who could obtain economic value from their disclosure or use.

51. CardioNet has undertaken efforts reasonable under the circumstances to maintain the secrecy of its trade secrets, as detailed above. Moreover, even if any individual item Gilbert exfiltrated might appear minor individually, the SCTSA requires consideration of the

information's collective effect. S.C. Code Ann. § 39-8-20(5)(b). Collectively, CardioNet's Customer Outcomes Reports, payor volume and cost data, notification criteria, and confidential customer communications provide a comprehensive competitive blueprint for CardioNet's business in Gilbert's former territory.

52. Gilbert misappropriated CardioNet's trade secrets within the meaning of S.C. Code Ann. § 39-8-20(2) by acquiring them through improper means and by disclosing, using, or threatening to disclose or use, the trade secrets without CardioNet's express or implied consent. Gilbert's conduct constitutes improper means under S.C. Code Ann. § 39-8-20(1), including by breaching his duty to maintain the secrecy of CardioNet's trade secrets.

53. Gilbert's continued possession of CardioNet's trade secrets, combined with his active employment at Wearlinq in the same territory targeting the same accounts, creates a credible and imminent threat of misappropriation. Even if Gilbert has not yet disclosed all of CardioNet's trade secrets to Wearlinq, his possession of CardioNet's competitive roadmap while actively competing for CardioNet's accounts constitutes threatened misappropriation.

54. Gilbert's conduct has allowed him to shortcut years of customer development and goodwill by using CardioNet's trade secrets to advance his sales efforts at Wearlinq. Once disclosed or used, CardioNet's trade secrets cannot be restored to their prior state of secrecy, exposing CardioNet to the loss of exclusivity, diminished competitive advantage, lost customer relationships, and further unauthorized use and disclosure. Gilbert's conduct has therefore caused and threatens to continue causing CardioNet immediate and irreparable harm for which there is no adequate remedy at law. CardioNet is entitled under S.C. Code Ann. § 39-8-50 to injunctive relief preventing Gilbert's actual and threatened misappropriation.

55. As a direct and proximate result of Gilbert's misappropriation, CardioNet has suffered and will continue to suffer damages. Pursuant to S.C. Code Ann. § 39-8-40, CardioNet is entitled to recover its actual losses and Gilbert's unjust enrichment not accounted for in calculating those losses or, alternatively, a reasonable royalty for Gilbert's unauthorized disclosure or use. Because Gilbert acted in willful, wanton, or reckless disregard of CardioNet's rights, CardioNet is also entitled to exemplary damages of up to twice its actual damages and an award of its reasonable attorneys' fees under S.C. Code Ann. § 39-8-40.

## COUNT III
## BREACH OF THE DUTY OF LOYALTY

56. CardioNet re-alleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

57. Throughout his employment, Gilbert owed CardioNet a duty to remain faithful to CardioNet's interests, comply with CardioNet's instructions and policies, and refrain from acts inconsistent with promoting CardioNet's best interests. This duty prohibited Gilbert from actively competing with CardioNet, sending confidential information and trade secrets to himself, or soliciting CardioNet's customers while still employed.

58. Gilbert intentionally breached his duty of loyalty while employed by CardioNet by:

a. **Exfiltration of CardioNet's property:** Gilbert systematically exfiltrated at least 15 documents containing CardioNet's confidential information and trade secrets to his personal email account for use in benefitting himself and Wearlinq.

b. **Breach of confidences:** Gilbert violated CardioNet's Confidentiality Policy and deleted evidence of his conduct.

c. **Abandonment of duties:** Gilbert failed to respond to a confidential customer inquiry about CardioNet's processes while retaining that inquiry for competitive use.

This conduct began June 15, 2026, continued after Gilbert submitted his resignation, and persisted through at least July 10, 2026, while Gilbert remained on CardioNet's payroll.

59. Gilbert undertook this deliberate course of disloyal conduct to advance his own interests and Wearlinq's interests at CardioNet's expense. As a direct and proximate result, CardioNet has suffered damages, including lost revenue and other losses caused by Gilbert's conduct. CardioNet is also entitled to recover the compensation and benefits paid to Gilbert during the period of his disloyalty, subject to the circumstances-based forfeiture analysis required under South Carolina law. Because Gilbert acted willfully, wantonly, and in reckless disregard of CardioNet's rights, CardioNet is further entitled to punitive damages in an amount to be determined at trial.

## COUNT IV
## CONVERSION

60. CardioNet re-alleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

61. CardioNet owned and had the immediate right to possess and control the documents, electronic files, reports, communications, and other materials that Gilbert transferred from CardioNet's systems to his personal email account and retained after his employment ended.

62. Gilbert intentionally and without authorization copied, transferred, concealed, retained, and exercised dominion and control over CardioNet's property in a manner inconsistent with and in exclusion of CardioNet's ownership and possessory rights. Among other things, Gilbert transferred at least 15 CardioNet documents and files containing confidential information

and trade secrets to his personal email account, deleted the sent emails to conceal his conduct, and retained CardioNet's property for his own use after his employment ended.

63. As a direct and proximate result of Gilbert's conversion, CardioNet has suffered irreparable harm, for which there is no adequate remedy at law, and actual and consequential damages in an amount to be determined at trial and is entitled to the return of its property or recovery of its value.

64. Gilbert acted willfully, wantonly, and in conscious disregard of CardioNet's rights, thereby entitling CardioNet to punitive damages.

**COUNT V**
**UNJUST ENRICHMENT**

65. CardioNet re-alleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

66. CardioNet conferred substantial, non-gratuitous benefits on Gilbert, including compensation and benefits; continued access to CardioNet's systems, documents, and business resources; and access to CardioNet's customer relationships, goodwill, and confidential and proprietary business information. CardioNet conferred these benefits with the reasonable expectation that Gilbert would perform his duties faithfully and use CardioNet's property and resources solely for CardioNet's benefit.

67. Gilbert realized and accepted the value of those benefits while using CardioNet's time, systems, business resources, customer access, and confidential and proprietary information to engage in overt steps to prepare to compete against CardioNet and advance his and Wearlinq's interests.

68. It would be inequitable for Gilbert to retain the documents belonging to CardioNet, his compensation, benefits, competitive advantages, profits, commissions, or other gains he

obtained through this misconduct because he accepted CardioNet's benefits while acting contrary to the purpose for which CardioNet conferred them.

69. CardioNet is entitled to restitution and disgorgement of the value of the benefits Gilbert unjustly retained, including compensation and benefits paid during the relevant period and any profits, earnings, commissions, or other gains attributable to his inequitable conduct, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, CardioNet respectfully requests that this Court enter judgment in its favor and against Defendant Foy Gilbert, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Gilbert, and anyone acting in active concert with him, from using, disclosing, or retaining any of CardioNet's trade secrets and confidential information;

b. An order requiring Gilbert to immediately return to CardioNet's counsel all electronic and hard copy files, documents, information and other property he obtained through his employment with CardioNet that is still in his possession, custody, or control;

c. An order requiring Gilbert to provide a sworn declaration identifying (1) all devices, accounts, and storage locations where CardioNet information was stored or transferred, (2) all persons to whom any such information was disclosed or transmitted, (3) any accounts or documents at Wearlinq where he copied or transferred any CardioNet information, and (4) describing all instances where he

has referenced or used any CardioNet information after his employment with CardioNet ended;

d. An order requiring Gilbert to submit his devices and accounts to a forensic imaging and search for CardioNet's information and for the forensic removal of such information. This includes any and all personal devices, email accounts, cloud storage, applications, and any other location where such information may be stored;

e. An order permitting expedited discovery;

f. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Gilbert, and anyone acting in active concert with him, from soliciting or servicing CardioNet's customer accounts referenced in the documents and information Gilbert exfiltrated from CardioNet;

g. Actual and compensatory damages in an amount to be determined at trial;

h. Disgorgement of any unjust enrichment obtained by Gilbert as a result of his unlawful conduct;

i. An order requiring Gilbert to forfeit and return all compensation paid to him by CardioNet during his period of disloyalty;

j. Exemplary damages of up to two times the amount of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and S.C. Code Ann. § 39-8-40;

k. Punitive damages;

l. Reasonable attorneys' fees and costs of suit;

m. Pre-judgment and post-judgment interest; and

n. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

CardioNet hereby demands a trial by jury on all issues so triable.

Dated: August 5, 2026

**FORDHARRISON LLP**

s/Jeffrey A. Lehrer
Jeffrey A. Lehrer
Federal I.D. No. 7677
jlehrer@fordharrison.com
100 Dunbar Street, Suite 300
Spartanburg, SC 29306
(864) 699-1152

**REED SMITH LLP**

Paulo B. McKeeby (Motion for *pro hac vice* forthcoming)
pmckeeby@reedsmith.com
Hannah B. Pool (Motion for *pro hac vice* forthcoming)
hpool@reedsmith.com
2850 N. Harwood Street
Suite 1500
Dallas, TX 75201
(469) 680-4200

Adam R. Roseman (Motion for *pro hac vice* forthcoming)
aroseman@reedsmith.com
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
(215) 851-8100

*Counsel for Plaintiff CardioNet*